ALABAMA NATIONAL BANK, Appellant, v. MOBILE AND OHIO RAILWAY COMPANY, Respondent.

St. Louis Court of Appeals, November 25, 1890

Bill of Lading: EFFECT OF TRANSFER. The transfer of a bill of lading operates only as a transfer of whatever title the transferor has at the time to the goods covered by it. And if a shipper takes a bill of lading to himself as consignee, and the carrier delivers the goods to another with the consent of the shipper, but without surrender of the bill of lading, a subsequent assignee of the bill of lading, though acquiring it without notice and for value, has no recourse against the carrier.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL D. FISHER, Judge.

AFFIRMED.

*Gibson, Bond & Gibson*, for appellant.

*Pollard & Werner*, for respondent.

BRIGGS, J.—This is an action for damages for the misdelivery of a carload of goods, shipped over the defendant's railroad to Mobile, Alabama.

On the twenty-first day of December, 1888, the Royster Provision Company of Birmingham, Alabama, shipped a carload of dressed beef from Sioux City, Iowa, to the city of Mobile, over the Illinois Central and the Mobile and Ohio railroads. The agent of the Illinois Central Railroad Company at Sioux City delivered a through bill of lading to the Provision Company, in which the latter was both consignor and consignee; but a request was indorsed on the bill of lading to notify Craft & Co., of the city of Mobile, of the arrival of the goods. On the seventh day of January, 1889, the Provision Company drew its draft for one thousand dollars on Craft & Co., and attached thereto the bill of lading. The draft was discounted by the plaintiff on the day of its date. Craft & Co. refused to pay, whereupon the draft was protested for nonpayment. The plaintiff then demanded of the defendant a delivery of the goods called for in the bill of lading, or the payment of the draft. The defendant declined to do either; hence this action for damages.

The defense was that, previous to the date of the draft, Craft & Co. had purchased the goods from the Provision Company, and that the defendant had delivered the goods to the purchaser with the knowledge and consent of that company. The case was submitted to the court without a jury, and the finding and judgment were for the defendant. The plaintiff has appealed.

The following instructions were given by the court of its own motion, and if they announced correct legal propositions, and there was substantial evidence upon which to predicate them, then the judgment of the circuit court will have to be affirmed:

" The court declares the law to be that, if the court, sitting as a jury, finds and believes from all the evidence

given in this case that, after the Royster Provision Company negotiated and delivered the draft for $1,551.85 with the bill of lading in question assigned to the plaintiff, and, after payment of said draft had been refused by Craft & Co., said Royster Provision Company paid the amount of said draft to the plaintiff and took it up, and received the bill of lading back from the plaintiff at the same time, and that, after so receiving back said bill of lading, and on the seventh day of January, 1889, said company drew the draft in question for one thousand dollars and delivered it with said bill of lading to plaintiff, and that plaintiff cashed said draft and paid the proceeds to said company, then the title to the property covered by said bill of lading, which was at that time in said company, passed to the plaintiff and none other; and, if the court further finds and believes from the evidence that, prior to the time said one-thousand-dollar draft was cashed, and with said bill of lading received by plaintiff, the property covered by said bill of lading had already been *delivered* to Craft & Co. by the defendant, and that said Royster Provision Company knowing of, and after, such delivery *had received payment of a sum of money from Craft & Co. on account of said property*, and that such sum paid said Provision Company, *in full*, for all amounts due it from Craft & Co. on any and all accounts, including said property covered by said bill of lading, and that such sum was so paid before said draft of one thousand dollars was cashed by plaintiff, then the title to the property covered by said bill of lading had passed to Craft & Co. before said one-thousand-dollar draft was cashed by the plaintiff, and it cannot recover, and the verdict should be for the defendant."

"The court declares the law to be that, if the court, sitting as a jury, finds and believes from the evidence given in this case that, after the Royster Provision Company negotiated and delivered the draft for $1,551.85,

with the bill of lading in question assigned to the plaintiff, and, after payment of said draft had been refused by Craft & Co., said Royster Provision Company paid the amount of said draft to the plaintiff, and took it up, and received the bill of lading back from plaintiff; and, after so doing, and on or about the seventh day of January, 1889, said Provision Company drew the draft in question for one thousand dollars, and delivered it, with said bill of lading, to plaintiff, and that plaintiff cashed and paid the proceeds of said draft to said Provision Company, then the title to the property covered by said bill of lading, which at that time was in said Provision Company, passed to the plaintiff, and none other.     And, if the court further finds from the evidence that, prior to the time said one-thousand-dollar draft was cashed, and with said bill of lading received by plaintiff, the property covered by said bill of lading had already been delivered to Craft & Co. by the defendant, and that such Provision Company, knowing of, and after, such delivery, had, on or about January 3, 1889, received the sum of one thousand dollars from Craft & Co., *on account of, and in part payment* for, said property covered by said bill of lading, and so delivered as aforesaid, and that said one thousand dollars was so received by said Provision Company before said one-thousand-dollar draft was cashed, as aforesaid, by plaintiffs, then the title to said property had passed to Craft & Co. before said one thousand dollars was cashed by plaintiff, and it cannot recover in this case, and verdict should be for defendant."

That the defendant introduced evidence tending to prove the facts hypothetically stated in the instructions, there can be no question.   We do not understand that the plaintiff controverts this proposition, except as to the assent of the Provision Company to the delivery of the goods to Craft & Co.   Upon this point it is asserted that there was no evidence.

Before referring to the evidence, which we think had a tendency to prove this disputed fact, it will be necessary to a proper understanding of it to state to some extent the facts and circumstances of the business relations between Craft & Co. and the Provision Company. - John Craft, who was doing business under the name of Craft & Co., testified in substance that the Provision Company was engaged in the shipment of dressed beef to various southern cities; that, about a month before the shipment in controversy, as an inducement for the witness to undertake the sale of its goods in Mobile, the Provision Company agreed to furnish witness with dressed meat for a month, and if there were any losses it would share them; that, in addition to this, it would furnish, at its own expense, an experienced butcher, and send to Mobile one of its experienced salesmen to represent it, and, also, to assist the witness in introducing the meats to the retail trade of the city; that, in pursuance of this agreement, the Provision Company did employ a butcher, and, also, sent to Mobile one of its clerks or traveling salesmen by the name of McDavid.

In reference to the carload of meat in controversy, witness testified as follows: "Q. Now, come to this car that is in controversy, and state what you know about that, as to when it arrived, and when the goods were delivered. A. The car arrived on the twenty-seventh day of December. It arrived before there was any memorandum or invoice; it hadn't been sent, or any other papers; and it [ the car ] was broken into by their man Craft, the butcher. Mr. McDavid came in on the noon train and came up and says: 'How did you get into that car?' I says: 'I don't know how they got into it; your man down there, I suppose, got the keys.' That is all that was said.

"Q. Did you have anything to do with opening it? No, sir; I never opened but one car, and that was the very first car that came.

"*Q.* Now, this car—was it unloaded? *A.* Yes, sir; it was unloaded in two or three days, and Mr. McDavid was down there several times after it was broken open, and saw the goods taken out.

"*Q.* When did the bill of lading with draft come to you [referring to draft for $1,551.85]? *A.* It came the next day, by mail.

"*Q.* After the car? *A.* Yes, sir.

"*Q.* Well, what did you do with that? *A.* I didn't do anything. The fresh portions of the meat were being disposed of as fast as they could, with the assistance of Craft and McDavid, and the other portion that came to my store I was disposing of as fast as I could. The car was, I think, either two or three days being unloaded.

"*Q.* What time was it entirely unloaded? *A.* I think it was unloaded about the twenty-ninth of December."

The witness then testified that he paid the small draft, but refused to pay the larger one; that he stated to McDavid that he wanted to quit the business, and that, if he paid that draft, he would overpay the Provision Company what he owed; that thereupon McDavid ordered the draft for fifteen hundred and fifty dollars to be returned without protest to the plaintiff; that, on the third day of January, McDavid asked him to pay him one thousand dollars on account of the last shipment, which he did, and that McDavid stated he wanted to send the one thousand dollars to Birmingham to aid the Provision Company in protecting the draft which had been returned.

James M. Crawford, who was clerking for Craft & Co. at the time, corroborated Mr. Craft in reference to the circumstances attending the delivery of the meat, and also the conversation between McDavid and Craft when the payment of one thousand dollars was made. In answer to a question, whether he knew anything

about the delivery of the carload of meat the witness said : "Yes, I do ; said car was delivered on December 26 or 27, 1888, to their [the Provision Company's] agent, Mr. E. R. McDavid. He, in connection with their butcher, a Mr. Craft, received and unloaded the car. This Mr. Craft was a butcher employed by the Royster Provision Company, and sent here (Mobile) by them from Cincinnati to assist in the business." It seems to us that this evidence disposes of the question adversely to the plaintiff.

The judgment of the trial court was based upon the fact, that the goods represented by the bill of lading were delivered to Craft & Co. prior to the purchase of the draft for one thousand dollars by the plaintiff, and that this delivery was made in the first instance with the consent of the agent of the Provision Company, or that the agent afterward ratified it by accepting payment in whole or in part from Craft & Co. That the trial court was justified in its conclusions of fact we are well satisfied. Whether it was right in its conclusion of law is the question in the case.

In the opinion of the trial court the plaintiff obtained no title to the property mentioned in the bill of lading, for the reason that the goods had been previously sold and delivered by the owner to Craft & Co. If the court was right in this, it necessarily follows that no action could be maintained by the plaintiff against the defendant for a misdelivery. It would serve no good purpose for us to review the various authorities relied upon by the plaintiff to overthrow this legal proposition. In our opinion it has been settled by the supreme court in the case of *Skilling v. Bollman*, 73 Mo. 669 ; hence nothing could be gained in a discussion of the law in other jurisdictions. In that case the court, in effect, decided that the delivery and transfer of a bill of lading for value was a symbolical delivery of the goods therein mentioned, and that the effect of such transfer would be to vest in the transferee whatever

title in the goods the transferor had at the date of the assignment; that, if the transferor had previously sold and delivered the goods to another, or had consented to the delivery by the carrier, then the holder of the bill of lading would obtain nothing by his purchase. In other words, the assignee by the transfer of the bill of lading could not convey a better title to the goods than he himself had. In the case cited, a lot of high wines was shipped by boat from Beardstown, Illinois, to the city of St. Louis. The owners were named as consignees. One of the owners accompanied the goods to St. Louis, and, upon their arrival, he sold and delivered a portion of them to Bollman. Just after this sale and delivery, or about the same time, another owner drew a draft against the shipment and attached the bill of lading to it. The plaintiff, who was a banker at Beardstown, discounted the draft. The court decided that, if the sale to Bollman was anterior to the sale of the draft, then the plaintiff acquired no title to the goods, but, on the other hand, if the purchase of the draft was first in time, then the title to the goods passed to the plaintiff as effectually as if there had been an actual manual delivery. It seems to us that the judgment of the circuit court in the present case finds direct support in the *Bollman case*, and, as the law of that case has never been questioned or overthrown, it must govern in determining the present controversy.

As against this position the plaintiff insists that the transfer of a bill of lading for value to an innocent holder *conclusively* establishes, as against the carrier, the right of the holder to demand the goods covered by the bill of lading; that the carrier in no case can justify a delivery without the surrender and cancellation of the bill of lading. This position can only be maintained upon the theory, that the title to the goods could only pass by the transfer and delivery of the bill of lading. As we have shown, this would be in the very teeth of the law in the *Bollman case*. It is true that, in the

*Bollman case*, the bill of lading was issued in duplicate, and that the absconding. partner who sold a portion of the goods to Bollman had one of them, but it appears that it was not surrendered either to the carrier or to Bollman.   We understand the rule to be this : If the carrier delivers the goods even to the original owner ( when he is the consignee ), or to the consignee himself, without the surrender of the bill of lading, it takes upon itself the risk of a previous transfer of the bill of lading to some innocent party.   If our statute, section 745, Revised Statutes, 1889, in any way changes the ·common law in this respect, it can have no application here, because this contract of affreightment was not made in this state, nor was it executed in whole or in part within this state.   The contract was made in Iowa, .and in the absence of testimony to the contrary, we must assume that the common law, as here interpreted, .is in force in that state.

What we have said effectually disposes of all other questions presented in the appellant's brief, and nothing could be gained by further discussion.   We think the judgment was for the  right party and it will, therefore, be affirmed.   All the judges concur.