AMERICAN ZINC, LEAD AND SMELTING COMPANY, Appellant, v. THE MARKLE LEAD WORKS, Defendant; MINERS' BANK OF JOPLIN, Respondent.

**St. Louis Court of Appeals, November 3, 1903.**

1. **Appellate Practice:** TRIAL DE NOVO IN EQUITY CASES.  In an equity case the appellate court tries the cause upon the whole evidence *de novo,* and the giving or refusing of declarations of law afford no ground for reversal.

2. **Bill of Lading:** DELIVERY WITHOUT INDORSEMENT.  A bill of lading represents the goods for which it is given and its delivery passes title as effectually as an actual delivery of the goods, though the bill is not indorsed.

3. ——: TRANSFER: TRANSFEREE FOR VALUE.  Where it was the custom of plaintiff to waive its rights to retain possession of ores sold to M. until paid for, and there being no evidence showing that an exception was made in respect to the two cars in controversy, and he suffered M. to possess himself of the cars and procure bills of lading for them on their contents in advance of payment, an innocent transferee for value of the bills of lading, from M, acquires good title as against plaintiff.

Appeal from St. Louis City Circuit Court.—*Hon. Franklin Ferriss,* Judge.

AFFIRMED.

*Percy Werner* and *Thomas & Hackney* for appellant.

(1)   The court erred in giving the first declaration of law, at the request of the interpleader, as to what constituted a waiver by the plaintiff of payment in cash on delivery of the ore.   This declaration was erroneous for the reason that it erroneously treated the question of plaintiff's intention of waiver as a conclusion of law when it should have been submitted as a question of fact, to be determined by the trier of the fact from the evidence in the case.   Drumm-Flato Com. Co. v.Crider Com. Co., 165 Mo. 84.   (2)   There was no delivery and there having been no delivery of the ore to Molloy by the plaintiff and the ore being still in plaintiff's custody at the expiration of the time agreed upon, the failure of Molloy to pay for the ore within that time avoided his right to take possession of the ore and vitiated the contract of sale, and the plaintiff still having possession of the ore, had the right to retain it thereafter. 24 Am. and Eng. Ency. Law (2 Ed.), pp. 1146-7; S. W. Freight, etc., Co. v. Stannard, 44 Mo. 84; S. W. Freight, etc., Co. v. Plant, 45 Mo. 517; Conrad v. Fisher, 37 Mo. App. 383.   (3)  Molloy having gotten possession of the property by improper means, his possession was tortious and the plaintiff had the right to take possession of the property and place it in the position in which the contract left it.   Burgeman v. Railway, 104 Mo. 85.   (4) The plaintiff having acted in ignorance of the bank's claim and of the transactions between Molloy and the bank, could not be held to have waived any of its rights, because a waiver necessarily presupposes both knowledge and acquiescence.   Haysler v. Owen, 61 Mo. 270; Johnson County v. Lowe, 72 Mo. 637; Farlow v. Ellis, 15 Gray 231.

*Seneca N. & S. C. Taylor* and *McIntire & Scott* for respondent.

(1)   In a suit in equity, it is the duty of the appellate court to consider the entire evidence and apply the law thereto.   The hearing on the appeal may properly be termed a trial *de novo.*   Robertson v. Shepherd, 165 Mo. 360; Sheridan v. Nation, 159 Mo. 27; Dunivan v. Dunivan, 157 Mo. 157; Hoeller v. Haffner, 155 Mo. 597; Hall v. Harris, 145 Mo. 604; Lins v. Lenhardt, 127 Mo. 271; Van Frank v. Road Co., 89 Mo. App. 460; Trimble v. Wollman, 62 Mo. App. 541; Gunby v. Rogers, 42 Mo. App. 465; Nichols v. Nichols, 39 Mo. App. 291.   (2) The appellate court will defer considerably to the findings of the trial court where the evidence is oral. Chance v. Jennings, 159 Mo. 544; Becht v. Becht, 168 Mo. 525; Carter v. Dilly, 164 Mo. 564; Hoeller v. Haffner, 155 Mo. 585; Strine v. Williams, 159 Mo. 582.   (3) In an equity case, declarations of law given and refused by the lower court afford no ground for reversal, because the appellate court in a case in equity tries the case upon the whole of the evidence *de novo.*   Hunter v. Miller, 36 Mo. 143; Moore v. Wingate, 53 Mo. 398; Palmer v. Crisle, 92 Mo. App. 510; Branson v. Dawson, 63 Mo. App. 359; Adams v. Harper, 20 Mo. App. 684. (4)   A bill of lading is the representative of the goods for which it is given, and its delivery will pass title as effectually as an actual sale and delivery of the goods. Skilling v. Bolman, 73 Mo. 66; Bank v. Homeyer, 45 Mo. 145; Ober v. Railroad, 13 Mo. App. 86; Means v. Bank, 146 U. S. 620; Railway v. Phillips, 60 Ill. 197; Broadwell v. Hoskins, 77 Ill. 305; Peters v. Elliott, 78 Ill. 321; Railroad v. Erwin, 46 Ind. 180; Bank v. Railroad, 69 N. Y. 376; Becker v. Holgarten, 86 N. Y. 167; Holmes v. Bank, 87 Pa. St. 525; Richardson v. Nathan, 167 Pa. St. 513; Holmes v. Bailey, 92 Pa. St. 57; Campbell v. Alford, 57 Tex. 159.   (5)   Delivery of bills of

lading without indorsement for value, transfers the title to the goods it covers as effectually as if the bills of lading had been indorsed. Schaefer v. Meyer, 133 Mo. 447; Bank v. Railroad, 62 Mo. App. 540; Bank v. Pfeifer, 108 N. Y. 200; Bank v. Railroad, 85 Hun 160.

BLAND, P. J.—Plaintiff is a corporation. In August, 1901, and for several years prior thereto, it, as lessee, operated a lead and zinc-producing mine in Jasper county, known as the Cornfield mine and made weekly sales of the products of the mine in carload lots. For two years previous to August, 1901, one T. C. Molloy made weekly purchases of the lead ore plaintiff had for sale for cash on delivery in carload lots f. o. b. cars. The plaintiff had a private switch track near its mine which connected with the Missouri Pacific railroad, and cars were set in on the switch by the railroad company on the orders of plaintiff, for its convenience in loading its ore. It was the custom for Molloy in person, or by agent, to appear at plaintiff's office about the middle of each week and state the price he would pay for lead ore that week. If the price was satisfactory, the plaintiff would weigh and load its lead into the cars, seal them up and give Molloy the weights, when Molloy would pay for the ore, bill out the cars and send them forward. One L. B. Templeton was the purchasing agent of Molloy, in the Carterville district, and made about all of his purchases from the plaintiff, and bills of lading frequently were made out in Templeton's name. Don D. Molloy, a son of T. C. Molloy, was his general agent and had entire charge of his office and usually looked after the shipments of ore and procured the bills of lading. The principal office of the plaintiff was in Joplin, Missouri. W. D. Fisher was its general superintendent, but W. C. Glenn was the superintendent of the Cornfield mine and looked after the loading of

the ores from that mine, and their sale and payments were made to him for the ore produced at the mine.

The Markle Lead Works, a corporation, has its office in the Rialto Building, in the city of St. Louis; its plant is east of the river at Granite City, Illinois.

The Miners' Bank of Joplin is a banking corporation located at Joplin, Missouri.

On August 2, 3, and 5, 1901, the plaintiff loaded two carloads of lead ore on cars standing on its private switch. The loading of the cars was superintended by Glenn, and after being loaded were sealed by him to protect the ores from theft. About the middle of the week Templeton, the agent of Molloy, appeared at the office of plaintiff near Carterville and told Glenn the price of lead ore for that week would be $23.25 per thousand. Glenn agreed to the price and gave Templeton a memorandum of the weight of one of the cars that was then loaded and told him that he would not have the other car ready until Monday morning. On Monday morning Templeton telephoned to him for the weight of the second car for the purpose, he said, of making a report to his company. Glenn gave him the weight. On August 8th, Don D. Molloy got from the Missouri Pacific Railroad Company, at its commercial office at Joplin, bills of lading for each of the cars showing the numbers of the cars, the pounds of ore each contained, that they were received from L. D. Templeton, and were consigned to the Markle Lead Works, Granite City, Illinois. Late in the evening of the same day Don D. Molloy presented these bills of lading to the cashier of the Miners' Bank of Joplin to which he attached a draft drawn by T. C. Molloy in favor of the bank on the Markle Lead Works for $2,203.08, the supposed value of the shipment. The next morning, August 9th, the cashier entered a credit of $2,203.08 to Molloy's account with the bank and forwarded the bill of lading with the draft to its correspondent in St. Louis, the Commercial Bank. The Markle Lead Works refused

to pay the draft until it could have an opportunity to weigh and inspect the ore. This was finally assented to by the Miners' Bank and the bills of lading were delivered to the Markle Lead Works for the purpose of enabling it to get possession of the cars. On taking possession of the cars and unloading the ore it was found that on account of excess of weights, inferior quality of ore, demurrage and excess freight charges, the net value of the ore was $1,956.90. The bank agreed to accept this sum in payment for the ore. But before payment was made the plaintiff gave notice to the Markle Lead Works that it claimed the ore and demanded payment therefor. The Markle Lead Works refused to pay either the plaintiff or the Miners' Bank of Joplin. To enforce payment, suit was brought by the plaintiff against the Markle Lead Works for the value of the ore.

The Markle Lead Works answered that it owed either the plaintiff or the Miners' Bank the value of the ore ($1,956.90) but did not know to which of them the money should be paid and asked that the Miners' Bank of Joplin be required to interplead for the money and that it be allowed to pay the money into court and for its costs, and go hence without day. The court permitted the Markle Lead Works to pay the money into court and ordered the bank to interplead for the same. The bank appeared and by its interplea alleged the transfer of the bills of lading to it with the draft attached; that it in good faith cashed said draft and placed the proceeds to the credit of T. C. Molloy; that it accepted and cashed the draft on the faith of the transfer of the bills of lading to it by Molloy and alleged that the transfer of said bills transferred to it the two carloads of lead ore.

The answer of plaintiff to the interplea alleged that plaintiff never parted with its title to the two carloads of ore; that it never delivered it to Molloy or his agent Templeton, and that its cars were taken from its private switch track without its knowledge or consent; that its

sale to Molloy was for cash on delivery and that Molloy wrongfully and unlawfully, without the consent of plaintiff, took possession of said two carloads of ore without paying any part of the purchase price.

The bank filed a reply to this answer in which it is stated that the plaintiff permitted Molloy to take the cars of ore without first paying for them and that it was and had been a custom in the usual course of business between plaintiff and Molloy to permit Molloy to take possession of the cars of lead and to permit him to take out bills of lading in his own name, or that of another, and to pay for the ore subsequent to the taking out and shipping of the ore.

On the issues thus made up the cause was tried before the chancellor, who, after hearing the evidence, rendered judgment in favor of the interpleader; from which judgment plaintiff duly appealed.

Declarations of law were asked by the plaintiff, some of which were given, others were refused. Plaintiff assigns as error the refusal of declarations of law. As this is strictly an equitable proceeding (Duke, Lennon & Co. v. Duke & Woods, 93 Mo. App. 244; Funk v. Avery, 84 Mo. App. 491; Swain v. Bartlett, 82 Mo. App. 642), declarations of law given or refused by the trial court afford no ground for reversal for the reason an appellate court, in an equity case, tries the cause upon the whole evidence *de novo*, Hall v. Harris, 145 Mo. l. c. 620; Hunter v. Miller, 36 Mo. 143; Palmer v. Crisle, 92 Mo. App. 510, and will affirm the judgment, if for the right party, regardless of the error in giving or refusing declarations of law. Hall v. Harris, supra. It seems to us that the justice of the judgment depends upon whether Templeton, Molloy's agent, was, according to the previous custom of dealing between him and Glenn, plaintiff's agent, warranted in billing out the two carloads of ore before paying for them or whether he or Don Molloy willfully, wrongfully and unlawfully

billed them out without the knowledge or consent of Glenn.

Glenn testified that the terms of sale of all ores sold by plaintiff to Molloy were f. o. b. cars on the plaintiff's private track and that the custom was that as soon as the cars were loaded the railroad company took them away and on Saturday evening Templeton would call at the office and pay for the ore loaded during the week; that the billing of the cars was made by the ore buyers themselves and that he had permitted the buyers to obtain the bills of lading from the railroad company and ship right out and that the cars would be taken away on any day of the week whenever loaded and sealed; that Templeton gave checks for the ore whenever he got the weights; that after the cars were loaded they were counted by the purchaser and he presumed he (the purchaser) ordered them away; that he had always received pay on Saturday nights or Monday mornings from the purchasers for the preceding week's sales; that Molloy paid by checks on the Miners' Bank of Joplin; that he knew in a general way that as soon as the cars were billed they were sent forward.

In respect to the two cars in controversy, his evidence is that after giving Templeton a memorandum of the weight of one of them, on Saturday, August 3d, he told him he could not be ready for him until Monday morning, and that Templeton said that he would be over Monday morning and pay for the two cars and one other that had been previously shipped to Argentina, Kansas; that Templeton called him up on Monday morning and said that he wanted the weight of the second car so as to report to his company and that he could not come over that morning; that witness gave Templeton the weight of the second car and said: "Very well, the cars are on the track, let things remain as they are and come over in the morning." Templeton did not come over the next morning and witness tried to get him over the

telephone, but failed to do so. That on Wednesday morning, Don Molloy came over and offered to pay for the ore if he (Glenn) would knock off twelve hundred pounds alleged shortage on some previous shipments; that he told Don Molloy he could not allow it, that he had made it up once and would not make it up again. This was on the seventh of August. That it was then agreed between Don Molloy and Glenn that the matter should be referred to Fisher, the general superintendent; that the cars were at that time on the track, that he did not miss them until on the morning of the ninth, when he discovered they were gone; that about the middle of the day on Thursday, August 8th, he called up Don Molloy and told him he wanted the cars paid for and that the cars were then on the track and Don Molloy gave him some evasive answer; that the ore or no part of it was ever paid for and that he did not learn to what point it had been shipped for weeks afterwards. The bills of lading are dated August 8th.

Glenn further testified that he had sold ore in carload lots to Templeton, as agent of Molloy, weekly for two years prior to August, 1901; that the mine produced a great deal more zinc ore than lead and for this reason he never commenced loading lead ore until the middle of the week and loaded it on Thursdays, Fridays and Saturdays, and that Templeton would come over to his office on Saturday nights and give him a check for the ore loaded that week; that he did not know when the cars were billed out; but they did not leave the track before the check was given.

He further testified that, as was naturally the custom in his dealings with Templeton, as soon as the ore was loaded the railroad company took the cars away and he did not have a settlement with Templeton until Saturday night and sometimes not until Monday morning.

We think from the evidence of the witnesses it rea-

sonably appears that while it was understood that sales were all for cash on delivery, and that as a usual thing checks were given before the cars were taken from plaintiff's private track, yet this was not always so; that the day for settlement agreed on by usage was to pay on Saturday nights for ore loaded during the week, but if it happened the car was loaded previous to Saturday, the buyer was privileged to bill it and have it go forward before Saturday and to pay it on Saturday night. One of the cars in controversy was not loaded until on Monday, on which day Templeton agreed to pay for it. It was not billed or moved until the following Thursday. For some reason Templeton did not appear at the plaintiff's office on Monday, but Don Molloy did and offered to pay for the two carloads of ore, provided Glenn would allow a reduction of twelve hundred pounds on account of an alleged shortage on previous shipments. Glenn refused to allow this and referred the matter by telephone to Fisher, the general superintendent, who agreed to take the matter up and did take it up. Here the matter rested for several days, when a protested draft for $953.25, for a previous carload of ore, was brought forward and an effort made to secure it; and the two loads of ore. Molloy, it seems, without knowing that his son, Don Molloy, had transferred the bills of lading, gave plaintiff an order on the Markle Lead Works for the proceeds of the ore. This order he undertook to repossess himself of after learning of the transference of the bills of lading.

The evidence, on the part of the interpleader, which is uncontradicted, shows that the bank took the bills of lading and draft in good faith in the ordinary course of business; that it credited the proceeds of the draft to the account of Molloy, who in a few days thereafter, and before the bank learned of the claim of plaintiff to the ore, checked about all of his funds out of the bank. The bills of lading were not indorsed by Templeton.

The cashier of the bank testified that Molloy had been doing business with the bank for over a year and the bills of lading for ore purchased by him were frequently made out in the name of Templeton and delivered to the bank with Molloy's drafts attached, as in this instance, and that he knew the ore was Molloy's.

A bill of lading represents the goods for which it is given and its delivery passes title as effectually as an actual delivery of the goods, even though the bills are not indorsed. Scharff v. Meyer, 133 Mo. 428; The Davenport National Bank v. Homeyer, 45 Mo. 145; Bank v. Railroad, 62 Mo. App. 531; Alabama National Bank v. Railroad, 42 Mo. App. 284; Means v. Bank of Randall, 146 U. S. 620. But if the goods were stolen from the owner, or their possession obtained tortiously, the owner would not lose his title, if the thief or tortfeasor should obtain a bill of lading for the goods from a common carrier and afterwards for value indorse and deliver the bill to an innocent party. There is no evidence tending to show that Molloy or Templeton stole the ore or that possession of it was gotten by any tortious proceeding, or even that Molloy got it with the intent never to pay for it. But on the contrary we think the evidence shows that Molloy took possession of the goods under his contract of purchase, not strictly according to its terms, but in a manner and by warrant of a custom of dealing that had been theretofore practiced between his agent and the agent of plaintiff.

We do not think that the evidence makes it plain that Glenn notified either Templeton or Don Molloy that the usual course of dealing should be departed from in respect to these two cars, or insisted that the ore should be paid for before Molloy would be permitted to bill the cars and send them forward. His testimony is vague and indefinite in this particular, while he makes it clear that in fact when a car contracted for by Molloy was loaded and sealed he had the privilege of billing it and having it sent forward before paying for it. In

other words, it was the custom of plaintiff to waive its right to retain possession of ores sold to Molloy until paid for and there is nothing in the evidence satisfactorily showing that an exception was made in respect to the two cars in controversy. But whether plaintiff intended to part with its title to the ores before payment or not, we think it is evident that by its course of dealing with Molloy it suffered him to possess himself of the cars and to procure bills of lading for them or their contents in advance of payment. In these circumstances the bank, being an innocent transferee for value, the loss should fall on the plaintiff who put it in the power of Molloy to make the transfer. Neuhoff v. O'Reilly, 93 Mo. 164; Nat. Bank v. Railway, 132 Mo. l. c. 509; Cowgill v. Petifish, 51 Mo. App. 264.

We think the learned chancellor found for the right party and affirm the judgment. *Reyburn* and *Goode, JJ.,* concur.