HERCULES POWDER COMPANY,

*Appellant,*

vs.

THE STATE BOARD OF EQUALIZATION OF THE STATE OF WYOMING,

*Respondent.*

(No. 2429; August 16th, 1949; 208 Pac. (2d) 1096)

269

For the appellant the cause was submitted on the brief of Loomis & Lazear of Cheyenne, Wyoming and oral argument by Mr. Loomis.

For the respondent the cause was submitted on the brief of Norman B. Gray, Attorney General, John S. Miller, Deputy Attorney General and Marion R. Smyser, Asst. Attorney General, all of Cheyenne, Wyoming and oral argument by Mr. Smyser.

## OPINION

RINER, Chief Justice.

The appellant, Hercules Powder Company, by direct appeal has brought a judgment of the District Court of Laramie County here for review. That judgment affirmed an order against appellant made October 7,

1947 in favor of the State Board of Equalization of the State of Wyoming, respondent, which order had also affirmed an assessment against appellant for a certain amount asserted to be due as sales tax, use tax, penalties, and interest. Subsequently herein the Hercules Powder Company will, for convenience, be usually designated as either the "appellant" or the "Powder Company" and the State Board of Equalization will be ordinarily referred to as the "Board."

A brief outline of the pleadings of the parties in the District Court will afford a substantial presentation of the positions taken by these parties in this litigation as well as the issues involved.

The petition of appellant alleges in paragraph "1" that it is a corporation organized and existing under the laws of the State of Delaware. Paragraph "2" states that about April 23, 1946 the appellant was notified by the Board that there was due from the Powder Company to the State of Wyoming certain assessed sales taxes and use taxes, the former totaling $2,348.64 and the latter $2.47 and that the board affirmed said assessment by its order of October 7, 1947, a copy of which is attached to the pleading and made a part of it as "Exhibit A". Paragraph "3" states that the amount of the use tax being negligible, no contention is now made by appellant regarding it but the latter's rights are reserved as to any future use tax assessments. By paragraph "4" it is recited that the larger sum above mentioned is due, as the Board claims, only as a sales tax.

Paragraph "5" alleges that the only substantial distinction between the transactions wherein a use tax is assessed and based and those wherein a sales tax is assessed and based is that the former involves sales of commodities sold F. O. B. cars of interstate carriers at points without this state while the latter dealt with

commodity sales F. O. B. cars of interstate carriers at points within Wyoming. Paragraph "6" states that as a Delaware corporation it was authorized to do business in this state; that it is a manufacturer and seller of explosives and incidental materials; that it had no office nor any stock of such explosives or materials and no mill or magazine within the State of Wyoming; that it had no agent other than its statutory agent for the service of process in this state; that it had not taken out nor was it required to take out a Wyoming license as a wholesaler or retailer under the Wyoming Selective Sales Tax Act; that from about August 1, 1944 to about February 26, 1946 appellant had a special representative in the State of Wyoming to give technical or engineering advice to seismograph crews, said representative living in Wyoming during the period stated but having neither office nor phone listing in appellant's name, taking no orders from Wyoming customers; that appellant had service men in Wyoming during said period, one of whom covered territory served by appellant from its Denver office and the other covered territory served by its Salt Lake City office; that these men took no orders from Wyoming customers but were credited with sales in such Wyoming territory as was arbitrarily assigned to them by appellant; that all Wyoming orders for customers in this state were handled through the Denver or Salt Lake City offices of appellant; that no orders were ever shipped into Wyoming without the approval of these two offices, such orders as involved the assessment mentioned above having been sent by mail or telephoned to Denver or Salt Lake City offices or were received there from extra-Wyoming sources and were filled from mills or magazines without Wyoming; that such orders were delivered to interstate carriers by appellant at points without Wyoming for transportation on straight, uniform bills of lading for delivery by such

carriers to purchasers at destination points within Wyoming; that appellant's Denver and Salt Lake City offices billed Wyoming customers by mail and the latter's remittances for the goods purchased were so received at such offices.

Paragraph "7" of appellant's petition states that the transactions above described are not subject to the tax imposed by the Selective Sales Tax Act aforesaid because the sales were not made in this state, but outside of it; because the sales were made in interstate commerce and being so made are transactions which Wyoming is prohibited from taxing under the United States Constitution and laws and are, consequently, exempt under the Wyoming Selective Sales Tax Act, (Section 32-2506, W. C. S. 1945).

Paragraph "8" asserts that Wyoming can not tax sales in such transactions because of the commerce clause of the United States Constitution, Article 1, Section 8 and that such sales tax constitutes an unreasonable burden upon interstate commerce contrary to the above named article and section of the instrument last mentioned.

Paragraph "9" alleges that the sales tax thus assessed is laid upon transactions which come within the Wyoming Use Tax Act (Sections 32-2601—32-2628 inclusive, W. C. S. 1945); that said use tax act provides for certain exemptions, particularly in Section 32-2604, (k) thereof, and that the above sales tax assessment attempts to deprive appellant and its customers of those exemptions and thus attempts to deprive these parties of their property without due process of law, contrary to the Fourteenth Amendment to the United States Constitution. Paragraph "10" substantially reiterates the appellant's claim based upon the Fourteenth Amendment just mentioned. Paragraph "11" avers that this sales tax assessment

is contrary to the Board's rules and regulations particularly rule 25 in effect at all times involved herein, said rule reading:

"If tangible personal property is purchased from a retailer in another state and shipped by the retailer directly to the customer in this state, the receipts from the sale of such property are not taxable under the Sales Tax Act but are subject to the Wyoming Use Tax Act of 1937";

that this rule constitutes the Board's interpretation of the Selective Sales Tax Act and was relied upon by appellant in its handling of the transactions herein involved; that it is inequitable and unlawful to thus assess the sales tax as hereinabove described without first repealing this rule.

Paragraph "12" claims the sales tax assessment in question here to be invalid for all the reasons as above given and it should be set aside.

It is stated in paragraph "13" of appellant's petition that a certified copy of the Board's record in this matter is filed with this pleading. It is prayed that the sales tax assessment aforesaid be set aside and such assessment with respect to use tax be made without prejudice to the rights of appellant or those whom it represents in the collection of such taxes with respect to any future assessments of use tax.

The Board's answer admits the allegations of paragraphs "1" to "5" inclusive of said petition. It admits the allegations of paragraph "6" of said pleading except that it denies that appellant had no agent other than its statutory agent for service of process in Wyoming and that appellant was not required under the Selective Sales Tax Act of this state to obtain a wholesaler's or retailer's license; that appellant sells its products within Wyoming to customers or to wholesalers who in turn re-sell such products to the consum-

er. The allegations of paragraphs "7", "8", "9", and "10" are denied. Rule 25 of the Board is admitted to be worded as pleaded above and that it was in effect at all times herein involved. All other averments of paragraph "11" above set forth are denied. The allegations of paragraph "12" are also denied. Those of paragraph "13" are admitted. All allegations of plaintiff's pleading not admitted are denied. Affirmance of the Board's order in affirming the assessment of the sales tax as above described is prayed and that judgment be given for the amount of the tax assessed as recited above.

A reply was filed by appellant denying "each and every new matter of fact in such answer alleged."

The cause was tried de novo in the District Court without a jury (Section 32-2513, W. C. S. 1945) with the result heretofore indicated. The material facts to be considered are not in controversy. The oral testimony of two witnesses for the appellant was presented on the trial but there was none offered on behalf of the Board. Documentary evidence was submitted by both parties and received without objection. Such parts thereof as we deem pertinent will be hereinafter reviewed. The oral testimony of the witnesses for appellant is comparatively brief and we shall abstract here its pertinent portions as we interpret them.

James W. Alexander, a resident of Wilmington, Delaware, employed as a tax accountant collecting data for the sales tax on behalf of appellant, testified that appellant is licensed under the provisions of the Use Tax Act but not under those of the Sales Tax Act of Wyoming; that he is familiar with Rule 25 of the Board (quoted above in appellant's petition) and has read it; that appellant depended on this rule in its sales transactions in Wyoming and gave it a great deal of weight in the determination of appellant's sales;

that he is familiar with the manner in which the appellant's shipments into Wyoming are handled; that these orders are handled either in appellant's Salt Lake City, Utah office or its Denver, Colorado office; that no orders are ever taken for shipment into Wyoming without approval thereof in one or the other of those two offices; that the audit upon which the assessment in this case was made was conducted in the Salt Lake City office of appellant, there being no records at all of appellant kept in the State of Wyoming; that the Powder Company has no office in Wyoming and no agent in Wyoming other than one who receives service of process, the statutory corporate agent for that purpose; that the company has no telephone listing in Wyoming.

On cross examination this witness testified in part that appellant took out its Use Tax License in Wyoming the latter part of the year 1944; that appellant makes sales to consumers and sales to wholesalers that re-sell; that the orders to appellant originating from the consumer in Wyoming, are placed largely by letter; some are placed by telephone to either the Salt Lake City or Denver offices of the Powder Comany; that at the time of trial the appellant had no field men assigned to the Wyoming area but some time ago appellant had a man, a technical representative, for approximately the period of the Board's audit; that he left appellant's employ March 1, 1946 and has not been replaced; that he resided for a time in Casper, Wyoming; that this man was in Wyoming as a technical assistant to seismograph crews giving them advice as to the proper type of powder to use for exploration work and straightening out troubles if any; he was not called an underground man; that he never took orders for appellant in the State of Wyoming; that when appellant receives an order from a customer in Wyoming, the appellant makes an acknowledgment of

that order to the customer; that there are two forms of acknowledgment, and the form marked Respondent's Exhibit A (form No. 6432-75M-7-45) is used when the customer's orders from this state move from appellant's mill supplies; that the form marked Respondent's Exhibit B (form No. 7112-10M-4-46) is used when the order for the customer in Wyoming will move from appellant's magazine; that the appellant's mill supplies are located at its Bacchus, Utah plant; that that plant ordinarily supplies Wyoming orders; that orders for Wyoming customers from magazines would probably move either from the Salt Lake City magazine, just outside that city, or from appellant's Littleton, Colorado magazine; that there are specialized types of powders which is not in a magazine will have to go through appellant's mill in order to supply it; that the coal mines require a powder called a permissible powder as defined by the Bureau of Mines which "can be used" in mines without endangering lives from setting off a dust explosion.

A. W. Stibich, manager of appellant's Salt Lake City office since 1913 testified that he is familiar with appellant's operations as they affect the State of Wyoming; that the entire State of Wyoming is assigned to the Salt Lake City office of appellant and that was the fact during the times involved in the assessment in question here; that a part of Wyoming was assigned at one time to appellant's Denver office; that appellant's operations as they affect Wyoming are identical in handling in either the Denver or Salt Lake City offices; that the Union Pacific Coal Company located at Rock Springs, Wyoming always mails its orders in to and they are acknowledged by appellant's Salt Lake City office on forms either "Exhibit A" or "Exhibit B" as they pertain to the assessment here involved; that Exhibit "3" shows one of appellant's transactions with the Union Pacific Coal Company, the order being mail-

ed to appellant's Salt Lake City office from Rock Springs, Wyoming after being issued by the coal company's purchasing agent; that this order was then transmitted to appellant's Bacchus mill, Utah, from the Salt Lake City office of appellant and when the goods are shipped the Salt Lake City office renders an invoice to the coal company in Rock Springs, Wyoming; that Exhibit "4" shows the handling of a purchase order issued by the Purchasing agent of the Colorado Fuel and Iron Corporation at Pueblo, Colorado which was mailed to appellant at its Denver, Colorado office; that when the Denver office received this order they drew for account of the Salt Lake City office a magazine order on form "Exhibit B" and from that order the magazine keeper at the Littleton, Colorado magazine made shipment to the Colorado Fuel and Iron Corporation at Sunrise, Wyoming, the invoice for the shipment being issued from the Salt Lake City, Utah office of appellant; the orders from the Colorado Fuel and Iron Corporation are all magazine type orders.

Referring to Exhibit "5" this witness stated that it was a sample of the Lion Coal Corporation order to appellant; that the Lion Coal Corporation purchase order was issued from that company's office in Ogden, Utah by the Company's general manager at that point. It called for electric blasting caps for shipments to their property at Rock Springs, Wyoming; that it being a magazine item it was placed on the Salt Lake City magazine and shipped from there to the property of the Lion Coal Corporation, billing being rendered said company from appellant's Salt Lake City office; that this is typical of the Lion Coal Corporation orders, except dynamite items which would be placed on the Bacchus mill instead of a magazine order; that many orders are sent to appellant from without Wyoming to appellant's Denver and Salt Lake City offices without Wyoming and are filled by being shipped from mill or

magazine of appellant without Wyoming to properties owned by the various customers in the State of Wyoming; that the items involved in the assessment here in question were shipped F. O. B. points in Wyoming; that a standard bill of lading was used by the carrier for handling all types of shipments.

This witness also stated that appellant has no office in the State of Wyoming; that appellant has no stock of explosives and explosive materials, no mill, no magazine in Wyoming, and no telephone listing; that the service work of the representative of appellant who lived for a time in Casper was to aid seismograph crews in the use of explosive reaming charges and to investigate results; his service was discontinued in April 1946 and he had no office nor phone listing in appellant's name in Wyoming; that appellant has no such representative in Wyoming at the present time; that this Casper representative lived in an hotel, then in a rented house which had a phone in his own name and after being evicted from that house, went back to the hotel.

This witness testifying as to the uniform practice of appellant with respect to F. O. B. shipments into Wyoming said that in Wyoming appellant has two price groups, one covering the lower counties of the state and the other the higher counties; that by "lower" is meant counties that are closer to the bottom part of the state, South and North; that these prices that appellant has in Wyoming are used more as a means of affording competitive prices to all customers within a certain specified area, the northern half and southern half and by means of this delivered price basis, appellant quotes F. O. B. destination; that it is not a question of possession or retaining title or any price set up; that appellant has fixed prices for certain Wyoming areas and in order to meet those prices appellant

ships F. O. B. to destination points in Wyoming so that the freight will be included in the price and so that it will be competitive to a closer mill.

On cross-examination Mr. Stibich stated that the Hercules Powder Company has no representative living in Wyoming; that it has two men who come in for service work only, one covering the area out of Denver and the other the western Wyoming coal fields; that these two men just call on customers, do underground demonstration work, investigate complaints but do not take orders from customers; that five copies of the Powder Company's acknowledgment Form 6432 (Respondent's Exhibit A supra) are made up and sent to the Powder Company's Bacchus, Utah mill and that mill manufactures the material called for by it and ordered by the customer and when manufactured, the product is shipped to Rock Springs, Wyoming in the particular case of the Union Pacific Coal Company order, concerning which witness Stibich was interrogated by respondent's counsel; that in case of loss in a shipment between origin point and destination, the Powder Company would not generally file a claim to the railroad for the loss; that with commodities losses have been sustained and generally the consignee files the claim; that this is for products such as turpentine and small shipments of blasting supplies that can be lost and which would be on delivered prices; that the sales to the Union Pacific Coal Company are credit sales, that company remitting after receipt of invoice of the material ordered; that on the first page of appellant's Exhibit No. 3 showing a sale to the Union Pacific Coal Company the word "salesman" appears and following it the name "B. H. Ludwig—356" is given; that this is the Powder Company's tabulation system of breaking up sales; that the Powder Company gives credit for certain territories to certain men no matter whether they sell goods or not if it happens

to be the territory he is travelling in and in this instance that territory is "356" in which Mr. Ludwig is a service man; that the Powder Company has no regular form of order which the customer companies make out and send in to appellant; that the customers send in their own order forms and that the Powder Company has never had a salesman's order form.

The respondent offered in evidence, and they were received without objection, its Exhibits A and B identified and described by the witness Alexander in his cross-examination reviewed above.

Exhibit A aforesaid on its face sets forth at the top thereof in red printed letters the following:

"Gentlemen:

This is to acknowledge and thank you for your order which (unless otherwise provided by written agreement) is accepted subject only to the terms and conditions of sale printed on the reverse side hereof (which supersedes all terms and conditions of your purchase order) and your order shall be filled in the following manner:"

At the bottom of said Exhibit, also in red printing, but in larger type appears this language:

"By accepting the above materials you agree to the terms and conditions of sale set forth on the reverse side hereof as well as those set out above."

On the reverse side of this Exhibit among other provisions entitled "Conditions of Acceptance" appear these:

"Unless included in the price, Buyer shall pay in addition thereto the amount of any tax or other charge now or hereafter imposed by any Federal, State, municipal or other applicable law, upon, with respect to, or measured by the production, sale, shipment, use and/or price of any material sold hereunder."

"Seller shall not be liable for any failure to deliver or for any delay in delivery when any such failure or delay shall be caused (directly or indirectly) by fires, floods, accidents, explosions, sabotage, strikes or other labor disturbances (regardless of the reasonableness of the demands of labor), civil commotions, riots, invasions, wars (present or future), acts, restraints, requisitions, regulations or directions of Government, voluntary or mandatory compliance with any request of the United States Government, or any officer, department, agency or committee thereof for purposes of national defense, voluntary or mandatory compliance with any request for materials represented to be for purposes of (directly or indirectly) producing articles for national defense or completing national defense facilities, shortages of labor, fuel, power or raw materials, inability to obtain supplies, failures of normal sources of supplies, inability to obtain or delays of transportation facilities, any act of God, or any cause (whether similar or dissimilar to the foregoing) beyond the reasonable control of Seller or Seller's normal sources of supply of any materials purchased for resale hereunder, affecting the production or delivery of any materials covered by this Agreement."

Exhibit B. above referred to, on its face reiterates at the top thereof and likewise in red type, provisions identical in phraseology with those recited above as appearing in a similar location at the commencement of Exhibit A aforesaid. At the bottom of this Exhibit (B) likewise appears in red type this language:

"Please read the terms and conditions of sale on the reverse side hereof. Your acceptance of the above materials shall constitute your agreement to the provisions set forth herein."

On the reverse side of this Exhibit B are also found under the heading "Conditions of Acceptance" provisions identically worded with those on the back of Exhibit A supra and set forth verbatim hereinabove.

In the documentary evidence submitted by appellant and received without objection are sundry written or-

der forms sent in by the Powder Company's customers on the latters' own stationery. They constitute portions of the appellant's Exhibit Nos. 3, 4 and 5 respectively which are papers indicating the manner in which the orders from certain customers of the Powder Company were handled in the Salt Lake City and Denver offices of that company. None of these order forms appear to direct the shipments of the materials they cover to be made as "prepaid" to destination or F. O. B. point of origin.

However, in the order form Exhibit 3 sent to the Powder Company at its Salt Lake City office by the Union Pacific Coal Company through its Rock Springs office for its mine located at that place appears the direction "Ship via Union Pacific." This was a so-called mill order for the Bacchus, Utah mill of the appellant and shows a shipment from that mill.

In the order form Exhibit 4 sent to the appellant at its Denver office by the Colorado Fuel and Iron Corporation through the latter's Pueblo office relative to materials for delivery at its mine located at Sunrise, Wyoming appears the direction "Ship cheapest way unless otherwise routed." This was a so-called magazine order to be shipped from the Littleton, Colorado magazine of the Powder Company.

In order form Exhibit 5 sent to the appellant at its Salt Lake City office by the Lion Coal Corporation through the latter's Ogden, Utah office concerning material for delivery for its Blairtown mine at Rock Springs, Wyoming there is embodied also the direction "Please ship via cheapest way to Lion Coal Corporation for Blairtown mine at Rock Springs, Wyoming. Mail invoice in duplicate with bill of lading attached, to Ogden office". This appears to be a Salt Lake City so-called magazine order which was to be and was forwarded from the Powder Company's Salt Lake City

magazine to Rock Springs, Wyoming. All the above orders were, by Powder Company's handling papers only, disclosed by the three Exhibits aforesaid, directed to be shipped "prepaid" to destination point.

Concerning appellant's Exhibit No. 6 elaborating somewhat the testimony of the witness Stibich hereinbefore abstracted, it is to be noted that he replied to the question:

"Now, with respect to the items that were shipped, the shipments made f.o.b. points in Wyoming, can you tell the Commission what sort of bill of lading was used?",

with the answer:

"Standard bill of lading was used such as used by the carrier for handling all types of shipments."

And to the question next following propounded in these words:

"Handing you papers marked Exhibit 6, consisting of four sheets, I will ask you whether that is a sample of the type of bill of lading used?",

the witness responded:

"If you say 'sample', yes. We use a regular printed bill of lading of our own, but it conforms to the uniform bill of lading, and the conditions are all the same. This is a railroad bill of lading."

At the top of Exhibit No. 6 aforesaid in large black type appear the words "Uniform Straight Bill of Lading—Original—Not Negotiable."

The pertinent provisions of the Selective Sales Tax Act of 1937 (Art. 25 of C. 32, W. C. S. 1945) to be considered read:

"Definitions.—When used in this Act . . .:

"(b) The term 'sale' or 'sales' includes installment and credit sales, and means any transfer of title or posses-

sion, or both, . . . of tangible personal property, for a consideration, . . . :"

"(e) . . . 'Retail sale' includes all sales made within the State to a consumer or user, or to any person for any purpose other than for resale, . . ."

"(m) The term 'in this State' or 'within this State' means within the exterior limits of the State of Wyoming . . ." (Sec. 32-2502, W. C. S., 1945)

" . . . From and after the effective date of this Act, within the limitation herein set out, there is hereby levied and there shall be collected and paid:"

"(a) An excise tax upon every retail sale of tangible personal property made within the State of Wyoming equivalent to two per cent. (2%), except as provided in subsection (e) of this Act (section), of the purchase price paid or charged, . . ." (Section 32-2504, W. C. S., 1945).

In connection with this statutory terminology there must be kept in mind also the language of Section 41-202 W. C. S. 1945 of the Uniform Sales Act of this state which provides:

"(1) *Where there is a contract to sell specific or ascertained goods, the property in them is transferred to the buyer at such time as the parties to the contract intend it to be transferred.*

"(2) *For the purpose of ascertaining the intention of the parties, regard shall be had to the terms of the contract, the conduct of the parties, usages of trade and the circumstances of the case.*" (Italics supplied). And especially also that portion of Section 41-203 of the Act last mentioned which provides:

"*Unless a different intention appears,* the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer:

"Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon." (Italics supplied).

Before proceeding further in this discussion of the case at bar we should mention two prior decisions of this court which bear more or less directly upon the contentions advanced by the parties herein. These are Morrison-Knudson Co. Inc. vs. State Board of Equalization et al., 58 Wyo. 500, 135 Pac. 2d 927 and Creamery Package Mfg. Co. et al. vs. State Board of Equalization et al., 62 Wyo. 265, 166 Pac. 2d 952.

In the Morrison-Knudson case it was said:

"In the case at bar, under the terms of the contract, the sales were made f.o.b. Parco, Wyoming. That was the place of delivery and passing of the title to the purchasers, unless an intention to the contrary appears. Sec. 98-906, Rev. St. 1931; 55 C. J. 332-333. No such contrary intention appears herein. The purchasers paid the freight, and, according to their testimony, they remitted the purchase price to the seller, or, in some instances, paid it in this state. Part of the property was hauled to Parco and delivered to the railroad company. The delivery at that point was not interstate commerce."

It was declared in the Creamery Package case to be the rule that a foreign corporation was not rendered subject to a sales tax by merely appointing an agent upon whom process might be served but who did none of the ordinary business for the corporation in this state. It was held in the case last above cited that the fact that the foreign corporation sent an engineer into the state for the purpose of supervising installation of equipment sold by that corporation for use in Wyoming was merely incident to interstate commerce and did not constitute "doing business" in the state so as to

subject the corporation to imposition of taxes in Wyoming. It was further declared in the Creamery Package Company case that:

"We think, in short, that we are not warranted in holding that the plaintiff in this case has a place of business in this State, when in fact it has none, or *that it can be compelled under present authorities to become an agent of this State in collecting the use tax involved herein. It is, therefore, not liable for any.* (Italics supplied).

In connection with this excerpt it may be noted, as stated in the opinion, that the Creamery Package Mfg. Co. never had taken out a sales tax license and had "never obtained a certificate to collect use tax in this state." In the case at bar the Powder Company has voluntarily taken out a license to collect the use tax as already indicated.

Referring to the bill of lading used by the Powder Company in the transactions involved in the case at bar, it should be noted that 13 C. J. S. 233 states that:

"*A straight bill* of lading is one in which it is stated that the goods are consigned to a specified person.

"*An order bill* is one in which it is stated that the goods are consigned to the order of any person named in the bill."

9 Am. Juris. 690, Section 440 upon the authority of an extremely extended list of cited cases says that:

"The universal rule is that *a bill of lading is a symbol of property therein mentioned* as having been received for transportation, *and when properly transferred, will operate to pass the title to the goods while in transit as effectually as though a bill of sale had been made and the goods themselves delivered.*" (Italics supplied).

And we find the Supreme Court of the United States when considering the same principle using the follow-

ing language in Means vs. Bank of Randall, 146 U. S. 620, 13 S. Ct. 186, 36 L. Ed. 1107:

"As to the four car loads named in the bill of lading, that instrument represented the cattle; and the transfer of the ownership as well as of the right of possession was made as effectually by the transfer of the bill as it could have been by a physical delivery of the cattle. Conard v. Atlantic Ins. Co. of N. Y. 26 U. S. 1 Pet. 386, 445 (7: 189, 214); Dows v. National Exch. Bank of Milwaukee, 91 U. S. 618 (23: 214)."

Discussing the characteristics and effect of the "straight bill of lading" Vold on Sales page 316 remarks that:

"A straight bill of lading names an indicated party as consignee. If the straight bill of lading names the buyer as consignee, it is evidential, but is not conclusive, that the shipping seller who procures it to be thus made out by the carrier intends the buying consignee to be the owner of the goods, and that the carrier is therefore to be a bailee for the buyer while the goods are in its possession en route to destination."

In Atlantic Coast Line R. Co. vs. Roe, 91 Fla. 762, 109 So. 205 it was said that:

"Where a carrier receives goods under a contract to deliver them to a person named, without any reservation of power of disposal by the consignor, delivery to such person or his authorized agent completes the contract of carriage and relieves the carrier from any further liability on that feature of the contract. This doctrine rests upon the theory that the title to the goods passes to the consignee on delivery to the carrier. See 10 C. J. 256; 4 R. C. L. 819, 821, 838, 839."

Similarly it is announced in Corby Supply Co. vs. Thompson 186 Mo. App. 95, 171 S. W. 661:

"A bill of lading represents the goods for which it is given, and its delivery passes the title as effectually as an actual delivery of the goods. Smelting Co. v. Lead Works, 102 Mo. App. 158, 76 S. W. 668; Scharff v. Meyer, 133 Mo. 428, 34 S. W. 858, 54 Am. St. Rep. 672;

Benjamin on Sales (6th Ed.) § 813. Without objection whatever, defendant accepted the bill of lading on January 11th with full knowledge of the delay then accrued. Obviously, such is to be regarded as an acceptance of the goods then in possession of its agent." See also Pacific Lumber Agency vs. National Air Craft Materials Corporation, 108 Vt. 10, 182 Atl. 192.

Relative to those certain provisions concerning risk of loss of the property sold and set forth on the reverse side of the powder company's acknowledgment of customers' orders and which embody important and controlling portions of the contract between the seller and the buyers, we may observe that 2 Williston on Sales (Rev. Ed.) 214, Section 301 says that:

"In the English and American law of sales of goods there is singularly little discussion in regard to the risk before transfer of the property. It was early assumed without discussion that the maxim *res periit domino* (property destroyed is lost to its owner) was of universal application, and this assumption has sufficed to fix the law",

and also that "as risk of loss attends the property in the goods so does the chance of benefit." The same author in the following section of the cited text, Section 302 reiterates this principle in these words: "Risk of loss or deterioration is a natural incident of ownership."

Considering F. O. B. shipments in their bearing upon the passage of title as indicated in the law of sales 46 Am. Jur. 609, Section 442 points out that:

"The foregoing general rules that title passes as between the parties at the point from or to which shipments of goods are to be made f.o.b. give way when a contrary intention appears. Where, for example, the agreement as a whole shows clearly that the phrase 'f.o.b. at point of destination' was used merely to designate the party by whom the freight was to be paid, rather than the place at which delivery and the passing

of title were to be consummated, it will be so restricted, and the title held to pass at the point of shipment in accordance with the intent of the parties."

This statement is in accord with Mr. Williston's view as expressed in his text above cited, page 101, Section 280b where he declares that:

"As the rule that the property passes as soon as the goods are delivered at the point where they are free on board is merely one of presumption, it will yield to other terms of the contract indicating a contrary intention."

This, as we have seen, accords, too, with the provisions of our Uniform Sales Act quoted above.

As illustrative of what circumstances may indicate, an intent that the property in the goods shall pass from the vendor to the vendee before they arrive at destination under a F. O. B. that place, is very well disclosed in the two cases, United States vs. Andrews, 207 U. S. 229, 28 S. Ct. 100, 52 L. Ed. 185 and Electric Storage Battery Co. vs. District of Columbia, 81 App. D. C. 135, 155 Fed. 2d 867.

In the Andrews case it was held that the presumption that title passed upon delivery of a consignment of printing paper to a carrier designated by the United States Government, the buyer, under a contract made by it for the purchase of the paper and the acceptance by the buyer of the bills of lading made to the consignee—a government official, or his order,—was not rebutted by the fact that in the contract composed of different instruments there was a provision that the goods were to be delivered F. O. B. place of destination, the City of Manila in the Philippine Islands, the meaning of the term as construed with other portions of the contract indicating that it referred to the payment of freight by the seller which was to be included in the purchase price rather than the place at which

delivery and the passing of title was to be consummated. In his able consideration of this phase of the case, Mr. Justice White said this:

"That, as a general rule, the delivery of goods by a consignor to a common carrier, for account of a consignee, has effect as delivery to such consignee, is elementary. That where a purchaser of goods directs their delivery for his account to a designated carrier, the latter becomes the agent of the purchaser, and delivery to such carrier is a legal delivery to the purchaser, is also beyond question. *Certain also is it that when, on the delivery of goods to a carrier, bills of lading are issued for the delivery of the goods to the consignee or his order, the acceptance by the consignee of such bills of lading constitutes a delivery.* Of course, the presumption of delivery arising from the application of any or all of these elementary rules would not control in a case where, by contract, it clearly appeared that, despite the shipment, the goods should remain at the risk of the consignor until arrival at the point of ultimate destination. And such in effect is the contention here made on behalf of the government. We come briefly, then, to consider the findings concerning the contract, for the purpose of showing that this contention is without merit.

"In considering the matter, it is to be conceded that the contract is not to be deduced alone from the letter of the Division of Insular Affairs of August 17, 1901, and the reply of Andrews & Company of August 28, but is to be ascertained by a consideration of those letters and the subsequent correspondence under which the purchase was concluded and the shipment made.

"The statement in the proposal of the Division of Insular Affairs of August 17, 1901, by which the negotiation was commenced. 'F. O. B. Manila', might give rise, if standing alone, to the implication that it was intended that the goods should be delivered at the cost of the seller at Manila. *But the further statement in the letter, that the freight from New York to Manila was to be a part of the purchase price, and to be paid as such by the purchaser, rebuts the implication that the words 'F. O. B. Manila' were understood as imply-*

*ing that the amount of the freight charges for the ship-ment of the goods to Manila should be at the cost of the seller.* These words not therefore having been used in their ordinary commercial sense, their meaning must be sought in the context of the proposal in which they are found. Considering that context, it would seem most reasonable to conclude that the words implied that, *as the government desired the freight to Manila to be included in the purchase price, the freight there-fore to Manila was to be primarily defrayed by the seller.* That this was the understanding of Andrews & Company we think results from their reply, in which no reference whatever was made to the F. O. B. Manila clause, but a willingness was expressed to furnish the paper at a price to be fixed by the price paid by the government in Washington for like paper, with the addition of the freight rate to the Philippine Islands, thereby saving the seller from bearing the burden of the freight to Manila, and at the same time securing to the government the delivery of the paper at Manila without the payment there to the carrier of the cost of the freight as such, *since that item would become a part of and be included in the price.* It is certain, when the subsequent correspondence is considered, that this construction, which the reply of Andrews & Company put upon the words 'F. O. B. Manila', as used in the proposal, was deemed by the Division of Insular Af-fairs to be the correct one, since that reply was, in the subsequent correspondence, treated by the division as being directly responsive to and an acceptance of the proposal submitted. Moreover, we think the subsequent correspondence, when considered in other aspects, makes certain the conclusion that the words 'F. O. B. Manila', as used in the proposal meant precisely what we have stated the context of the proposal indicated that those words were intended to imply. This we think results from the provisions of the letter of Aug-ust 28, selecting a particular firm to whom the goods were to be delivered for transport to Manila, and of all the other directions contained in the letter, since they are inconsistent with the theory that the words 'F. O. B. Manila' were used as meaning that the goods should not be delivered as directed, but should remain the property of Andrews & Company, and be under

their control and subject to their risk until deliverd at Manila." (Italics supplied).

The decision of the Court of Claims reaching a similar result was accordingly affirmed.

In the Electric Storage Battery Co. case the United States Court of Appeals for the District of Columbia reversed a ruling of the Board of Tax Appeals for that district in sustaining the action of the assessor in disallowing certain refunds of income taxes claimed by the battery company to have been overpaid under the district income tax act. This claim was based upon the conclusion that the sales of merchandise as shown in the original returns were erroneously assigned as from sources within the district aforesaid. The position taken by the assessor was grounded upon the fact that since the battery company admittedly agreed to pay and did pay the cost of transportation from its factories located in or near Philadelphia, Pennsylvania, of certain batteries sold to a consignee in the District, title to the merchandise passed only after delivery within the District and consequently was income from District of Columbia sources.

It appears that the battery company had entered into a written contract with one Payne to serve as its wholesale distributor in the District. The battery company had a branch office but no warehouse or stock of merchandise in said District. Summarizing the relationship existing between the parties under their contract the court stated:

"By the terms of the contract Payne was not to transact busness or make contracts with third persons in behalf of petitioner, nor represent petitioner, nor act in its stead. In short, the arrangement contemplated a relationship only of buyer and seller as the result of which the former would have exclusive distribution or selling rights in the District of Columbia. To carry this plan into effect petitioner's branch office in the

District would receive Payne's orders and transmit them for acceptance to the main office in Philadelphia. The merchandise was then shipped prepaid and settlement for the purchase price was made on invoices furnished buyer from time to time. When the goods were shipped to Payne petitioner sent him shipping memoranda which contained notations to the effect that petitioner was not liable for damage to goods in transit, that its responsibility ceased when it delivered the material in good order to the transportation company, and that all claims for loss or damage in transit should be made against the carrier."

The contention of the battery company and the legal question to be resolved in the case are put thus by the court:

"On this appeal petitioner insists that the decision of the Board is wrong because the merchandise in question, having been sold to Payne f.ob. shipping point, with an agreement that the risk of loss in transit should be assumed by Payne, title passed when delivery was made to the carrier, and that this result is not affected by the fact that petitioner agreed to pay the costs of transportation and reserved the right to select the carrier.

"It will therefore be seen that the single question for determination is whether the title to the merchandise passed within or without the District of Columbia."

The views of the judges in reaching the conclusion they did are found in these words:

"We are thus brought back to the question where title to the goods passed. The Board's decision that it was in the District is bottomed upon the fact that under the contract petitioner agreed to 'prepay transportation on all complete batteries'. And this fact the Board thought brought into operation Rule 5 of § 19 of the Uniform Sales Act, which reads as follows:

" 'If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer,

or to a particular place, the property does not pass until the goods have been delivered to the buyer or (have) reached the place agreed upon.'

"But we think this does not follow. The presumption which Rule 5 creates is declared by the District Statute not to apply in any case in which 'a different intention appears'. Hence, if the facts showed nothing more than a contract of purchase of goods in Philadelphia for delivery in Washington, seller to pay the cost of transportation, Rule 5 would apply and the Board's decision would be correct. Equally, if the terms of purchase are delivery 'f.o.b.' shipping point, and no more, there can be no doubt that title would pass at point of delivery to the carrier, for by the use of the term 'f.o.b.' the presumption is that the property in the goods passes at that time and place. The present case does not clearly fall within either of these precise situations, hence neither the presumption created by Rule 5 of the Uniform Sales Act nor the accepted connotation of the term 'f.o.b.' can, of itself, control the result. The prepayment of freight and the use of the term 'f.o.b.' are only two of the facts to be given consideration in determining the time and place at which the parties intended to pass title. The answer, as we have seen, must be found in other facts showing the actual intention of the parties. Here there is an abundance of other facts which convinces us that it was always intended that title would pass upon delivery to the carrier, for the contract not only provided for a sale 'f.o.b.' shipping point, but specifically provided that '* * * materials are shipped f.o.b. the Battery Company's shipping point regardless of transportation costs being "prepaid" or "collect" '. This language clearly portrays the fixed and definite purpose of the parties to make the title transfer period consistent with f.o.b. delivery and destroys any presumption arising out of payment of carriage by the seller. This is further buttressed by the provision of the contract that once delivery is made to the carrier, loss or damage thereafter sustained is solely for the account of the buyer. *The agreement of the seller to pay the freight, in these circumstances, amounts to no more than a method of adjusting the price, or an inducement to*

*secure the sale.* Certainly it is not of itself sufficient to contradict the expressed purpose of the parties that the goods are sold f.o.b. shipping point regardless of who pays the freight, that the seller's responsibility 'ceases upon delivery' to the carrier and that *the risks of transportation must be borne by the buyer.* Enough has been said to show that the provisions of the contract, which we have previously set out, demonstrate that transfer of title occurred outside the District of Columbia." (Italics supplied).

We may observe that these two cases are not relied on here as precisely on all fours with the case at bar but they do refer to and discuss certain factors which appear in the record before us and interpret them as aids indicating the "different intention" which Section 41-203 of our statutes supra operates in its opening sentence to declare when Rule No. 5 quoted above shall fall. See also A. J. Neimeyer Lumber Co. vs. Burlington & M. R. R. Co., 54 Neb. 321, 74 N. W. 670.

The crucial question presented by this record is thus submitted to us by the appellant:

"The principal controversy is whether the single factor, that the goods involved were shipped F.O.B. points in Wyoming, confers taxing jurisdiction upon the State of Wyoming and makes applicable the sales tax of this state."

Respondent prefers to state that question in these words:

"The principal controversy between the parties herein is whether or not the single factor of the lack of what might be described as a 'business office' within the State of Wyoming is sufficient to prohibit the State of Wyoming from assuming taxing jurisdiction under the Selective Sales Tax Act of 1937, of the transactions here involved."

Its counsel appear also to rely especially upon Rule 5 aforesaid and assert:

"There is nothing in the record that expresses an intention contrary to the rule fixed by Rule 5, Section 41-203, Wyoming Compiled Statutes, 1945, which is as follows:"

They appear not to attempt to analyze the record regarding this matter and the position taken seems to be based simply upon the quoted assertion. A careful study of the record on our part leads us to think that they are seriously mistaken.

The following significant facts shown by the evidence submitted herein and more or less completely reviewed by what has already been set forth and which are not disputed, appear to be as follows:

In the three order forms received in evidence and which apparently were regarded by the parties as typical, viz., one from the Union Pacific Coal Company, one from the Lion Coal Corporation and another from the Colorado Fuel and Iron Corporation, the carriers of the merchandise ordered appear to have been either selected by the buyers or positive instructions were given to the Powder Company as to the selection by it of the carrier which should transport the original goods consignment. In the order given the Powder Company by the Union Pacific Coal Company we find the direction: "Ship via Union Pacific". Of course the word "Railroad", though omitted in this shipping direction, is obviously intended and was so understood and meant by the Coal Company. In the Lion Coal Corporation order to the Powder Company the direction is found "Please ship cheapest way to Lion Coal Corporation for Blairtown Mine". The order of the Colorado Fuel and Iron Corporation contains this direction: "Ship cheapest way unless otherwise routed." Why the last two named corporations should be interested in having these shipments sent out either by rail or truck the "cheapest way" when the Powder Com-

pany prepaid transportation charges, is not clear, if nothing more than payment of freight was involved. In the Andrews case supra, it is to be noted that the United States, as buyer, designated the carrier to be employed.

It appears also that a straight bill of lading was employed by the Powder Company. That, of course, indicated the buyers as consignees. The Powder Company did not in any case, so far as the record discloses take from the carrier an *order* bill of lading thereby reserving title to the goods shipped in itself. This could easily have been done if the Power Company had intended to retain title in itself until the delivery of the merchandise at destination and payment of the freight and price thereon. In this connection, too, it is to be noted that the main office of the buyer, Lion Coal Corporation, was located in Ogden, Utah, the same state in which the selling Powder Company office was established. A like situation prevailed in the case of the main office of the Colorado Fuel and Iron Corporation as buyer, that being located at Pueblo, Colorado and the selling office of the Powder Company established at Denver, Colorado. It is a reasonable conclusion that the acceptances of the bills of lading as to these two buyers were made without the State of Wyoming and not at their mine offices in this state. That this is a proper conclusion would appear to be upheld by the directions found on the original order forms of the Lion Coal Corporation and the Colorado Fuel and Iron Corporation. On the form used by the corporate body first named—the Lion Coal Corporation—appears the direction: "Mail invoice made in duplicate, with bill of lading attached, to Ogden office." On the form employed by the Colorado Fuel and Iron Corporation referring to invoices and bills of lading the seller—the Powder Company—is directed to "Send original duplicate and triplicate (invoice) with bill of lading at-

tached, to the purchasing department, Pueblo, Colorado."

We have already quoted above the requirement made by the Powder Company in acknowledging all orders of merchandise and incorporated in the contract between the parties that the buyer should pay "unless included in the price" in addition to the price of the goods "any tax" imposed by "any Federal, State, municipal, or other applicable law, upon, with respect to, or measured by, the production, sale, shipment, use and/or price of any material sold hereunder"; and also that the seller substantially assumes no risk of loss and failure to deliver the merchandise sold. It will be remembered, besides, that Mr. Stibich testified on cross-examination that the Powder Company "files no claim for losses in transit" but that "generally the consignee files the claim."

Regarding F.O.B. destination point shipments made by the Powder Company into Wyoming, it appears, as we have seen, from our review of the record that there are two price groups maintained by the appellant, one for the counties of this state which are closer to the southerly state line and another for those counties which are closer to the northerly boundary of the state. Why this arrangement is made is explained by the witness Stibich in his testimony heretofore reviewed. It is done, as he says, so that appellant can quote uniform prices to everyone on the merchandise the Powder Company sells in these two areas. This witness also said that this kind of arrangement "is not a question of possession or retaining title or any price set up"; that in order to meet the competitive prices of any closer mill the freight "will be included in the price." Just here the significant fact may be mentioned that all orders for its products sent to the Powder Company by purchasers were accepted by it without

the State of Wyoming and the merchandise as ordered was delivered to the carriers without this state.

When to the foregoing listed factors are added that it is undenied that the Powder Company has never had a business office, never had any stock of explosives or explosive material, never had any magazine or mill for manufacturing its products, has never had any telephone listings in Wyoming, no representative in the State authorized to take orders for its products, the Powder Company having no such thing as a salesman's order form and all these matters are in their entirety examined in the light of the authorities recited and reviewed above, we are convinced that the sales of the Powder Company's products were and are made without the State of Wyoming and are not taxable as sales made within this commonwealth.

Reference is made in respondent's argument to the activities of the so-called service men who have come into the state on behalf of the Powder Company to "call on the trade", "do underground demonstration work" and handle "investigation of complaints". These men, as before pointed out, do not and are not authorized to, take orders for the merchandise sold by the appellant. It would certainly seem that their functions were and are not any more inclusive than those of the erecting engineers of the Creamery Package Corporation and whose work in this state was not regarded by this court as rendering that corporation to be one transacting business in Wyoming so as to make such corporation amenable to its Sales Tax Law. The brief of the Board filed in that case describing the operation of these engineers says that they supervise "the installation of the machinery" sold by the Creamery Package Corporation; they remain "on hand for forty-eight hours after the installation is complete to instruct the employees of the purchaser in the operation of the

installed equipment", and they also come into the state and repair and service machinery sold when requested to do so.

It is quite interesting, and significant, as well, to observe that in the Creamery Package Corporation case supra there seems to have prevailed as to some transactions in that case involved precisely the same situation as now is presented to this court. In the opinion in that case filed it is stated:

"Occasionally plaintiff sells an entire unit of refrigerating equipment in this State. The usual method in such cases is that the equipment is sent F.O.B. railroad cars at the station of the purchaser in this State."

There the Board itself in its brief in that case told the court:

"In a few instances the company enters into contracts to sell complete units of refrigerating equipment installed in the State of Wyoming. In such cases the customer enters into a contract on a form similar to Plaintiff's Exhibit 3. (R., p. 64) *In these instances the contract provides for delivery F.O.B. the purchaser's plant.*" (Italics supplied).

So the Board and its state counsel at that time functioning knew of the situation which in that case prevailed and which now is relied upon by it to establish the right to impose a sales tax upon appellant, yet the point was neither mentioned nor urged with the idea of presenting a crucial question in the case. Now, however, we are supplied with an extended argument and brief insisting that the point is not only important but vital and should control the disposition of the case at bar.

But if we should be mistaken in our views hereinabove expressed, there is still another phase of this case which leads us to the same result so far as concerns its disposal here. Rule 25 of the Board which

counsel tell us appears in the Rules and Regulations of that body "adopted March 14, 1941" seems, according to the Rules and Regulations adopted by said Board on June 12, 1947 as Rule 24, to have been regarded as operative at a much earlier date, to-wit "effective June 1, 1937". That rule declares, as we have seen, as admitted both by the pleadings and by the proofs herein, that where "personal property is purchased from a retailer" without Wyoming and shipped by him "directly to the customer in this state" the receipts from such a sale "are not taxable under the Sales Tax Act but are subject to the Wyoming Use Tax Act of 1937." The word "purchase" as Black's Law Dictionary (1944 Ed.) indicates, after referring to its peculiar use in real estate law,:

"is also much used in its more restricted vernacular sense, (that of buying for a sum of money,) especially in modern law literature; and this is universally its application to the case of chattels." Citing numerous cases.

This meaning would seem to be all that was intended in the rule phraseology given above.

Assuming the above statement, as the latest utterance by the Board, to be correct, the rule aforesaid has been operative in this state for the guidance not only of the Board but of those who deal with it for more than a decade. Indeed the proof is in the instant case that the Powder Company "depended on this rule and gave it a great deal of weight in" its "determination of sales." That this is so is confirmed by the fact also proven without dispute that in the latter part of the year 1944 the Powder Company voluntarily took out a Use Tax license authorization under the law of this state. The appellant concedes that the transactions here in question fall under the provisions of the Use Tax Law of Wyoming, a matter we do not find it necessary now to consider or decide. Appellant argues that:

"It is obvious that Rule 25 of the Board is published for the purpose of informing all taxpayers of the Board's interpretation of this act and is relied upon by taxpayers in formulating business policies. It is unfair and unlawful for the Board to now attempt to establish a contrary policy by this proceeding without first clarifying its rules for the benefit of taxpayers."

We are inclined to adopt the view thus suggested, especially when we find the Board raising no question at all in the Creamery Package Corporation case such as it now vehemently urges, upon a precisely similar situation, although such question could have been argued and submitted to this court as appropriately then as now. The language used by the Supreme Court of the United States in United States vs. Alabama Great Southern R. Co., 142 U.S. 615, 12 S. Ct. 306, 35 L. Ed. 1134, is peculiarly apropos here where that court said:

"We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department;—a construction which, though inconsistent with the literalism of the Act, certainly consorts with the equities of the case,— should be considered as decisive in this suit. It is settled doctrine of this court that, in case of ambiguity, the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change, whereby parties who have contracted with the government upon the faith of such construction may be prejudiced. It is especially objectionable that a construction of a statute favorable to the individual citizen should be changed in such manner as to become retroactive, and to require from him the repayment of moneys to which he had supposed himself entitled, and upon the expectation of which he had made his contracts with the government."

2 Sutherland's Statutory Construction (3d ed.) 521, 522, Sections 5107, 5108 declares that:

"One of the soundest reasons sustaining contemporaneous interpretations of long standing is the fact that reliance has been placed thereon by the public and those having an interest in the interpretation of the law. While the principle here is not strictly that of estoppel running against the government there is some analogy to that principle when the interpretation has been made by a government agency or officer."

"A contemporaneous interpretation is one made at or soon after the time of enactment, and given special consideration since it was made at a time when the circumstances leading up to the enactment of the statute are well known."

The editorial comment concerning the conduct of administrative agencies in the note in 153 A. L. R. 1194 appears to us as not only practically sound but also in accord with what is just and fair. That comment points out that:

"In view of the important part played by administrative agencies in modern life, and their expertness and wide experience in matters confided to their administration, it is believed that as a general proposition their regulations should, as concerns the effect of a retroactive change, be likened to judgments of a court of final appeal, rather than to judgments of a trial court, particularly if it is taken into consideration that the individual citizen has practically no choice in carrying on activities in reliance upon such regulations, prior to their being sanctioned by judicial decision."

To this may we add briefly that there is no good reason in this day and era that we can perceive why the agencies of the state—unless clearly by statute commanded to act otherwise—should not be held to the same standards of morality, equity and fair dealing that are exacted by the established courts of the land from the citizenry of the several states. Especially is this so where such bodies have given a contemporaneous construction to a new system of taxation and which they therein have been called upon by their of-

ficial oaths to inaugurate and administer. Such construction should properly carry decided weight. In the instant case if the Powder Company had known that the Board would now undertake to succeed in this litigation upon the position it now urges and adopts. it would have been an extremely easy matter for the appellant to have altered the contracts governing the sale of its products so as to have protected itself against such an attempted retroactive change.

Without further extending this opinion, we conclude that the judgment of the District Court of Laramie County under review should be reversed and the cause remanded for such further proceedings not inconsistent with the views herein expressed as the parties may be advised.

*Reversed.*

KIMBALL, J. and BLUME, J. concur.

BLUME, J. concurring.

The use tax is a tax complementary to the sales tax. It is intended, chiefly at least, as a tax on transactions in which a Sales Tax Act does not apply except, of course, where the Use Tax Act gives specific exemptions. It is in the main, at least, intended to apply on interstate transactions. Continental Supply Company vs. People, 54 Wyo. 185, 88 Pac. 2d 488. Now the Use Tax Act gives certain exemptions when goods are not readily obtainable in this state; that is to say on certain interstate transactions. Subdivision (k) of Section 32-2604, Wyo. Comp. St. 1945. The appellant in this case claims to be entitled to them. The Board has no right to ignore that legislative provision, at least where such claim is made, and it should be taken into consideration when determining whether or not the Sales Tax Act or the Use Tax Act applies to an interstate transaction, and the legislative will should be carried

into effect, if reasonably permissible under the facts. See what was said on that point in Creamery Package Manufacturing Company vs. The State Board of Equalization, 62 Wyo. 265, 280-282, 166 Pac. 2d 952. The question involved is, it is true, a bothersome one but bearing in mind what is here stated, I think I should concur in the opinion of the Chief Justice.

In the foregoing opinion of BLUME, J., RINER, C. J. and KIMBALL, J. concur.

## ON PETITION FOR REHEARING.

(No. 2429; October 18, 1949; 210 Pac. (2d) 824)

*Rehearing denied.*

The Supreme Court, RINER, C. J., denied a rehearing, holding that Supreme Court was not bound by fact findings of trial court since material facts were not in controversy, and that a rule of State Board of Equalization should not be disregarded and its interpretation changed so as to retroactively and unjustly affect taxpayers.

In support of the petition for rehearing, there was a brief by Norman B. Gray, Attorney General of Cheyenne, Wyoming.

## OPINION ON REHEARING.

RINER, Chief Justice.

A petition for rehearing in this case has been filed on behalf of respondent. Certain points are suggested and urged in support of the petition which may be briefly reviewed at this time. In connection with arguments traversing ground which we deem fully covered by the views expressed in the original opinion herein and which it would serve no useful purpose to reiterate, it is insisted that as the trial court made fact findings adverse to appellant we are bound thereby and may not disturb the judgment given below and based thereon.

In support of this contention the cases of Sims vs. Southern Surety Co., 38 Wyo. 165, 265 Pac. 450 and Dulaney vs. Jensen, 63 Wyo. 313, 181 Pac. 2d 605 are cited. In the Sims case both parties introduced testimony. There was testimony introduced in behalf of the defendant which, says the court, was "entirely inconsistent with the testimony of the plaintiff" given in the case. It was also indicated that the judgment in that case was "rendered after the testimony on behalf of the defendant was compared with and interpreted and considered in the light of that for the plaintiff whose witnesses appeared upon the witness stand." Likewise in the Dulaney case it was pointed out that there was not only evidence submitted on behalf of both parties but that there was testimony given for the defendant which was "in conflict with" plaintiff's testimony, and well known rules of appellate practice were referred to in the opinion filed declaring that under such circumstances the judgment below should not be disturbed. The Sims and Dulaney cases are accordingly without persuasive force here. The status disclosed in those cases and referred to above does not

obtain in the case at bar. In the original opinion herein it was stated that:

"The material facts to be considered are not in controversy. The oral testimony of two witnesses for the appellant was presented on the trial but there was none offered on behalf of the Board. Documentary evidence was submitted by both parties and received without objection."

Under a record such as we now have, the Supreme Court of Oregon has well stated the governing rule. In Harris vs. Schnitzer, 146 Ore. 391, 27 Pac. 2d 1010 the court, reversing a judgment below, after stating its views remarks that:

"In arriving at these conclusions, we do no violence to the rule that the findings of the judge who presided over the trial are the equivalent of a jury's verdict, and cannot be disturbed when supported by substantial evidence. There is no conflict in the evidence. The sole issue presented is the legal effect of this uncontradicted evidence."

The Supreme Court of California disposing of the case of In Re Fleming's Estate 31 Cal. 2d 514, 190 Pac. 2d 611 by a reversal of the judgment under review, has said:

"There being no dispute as to the facts in this case, the matter of the application and construction of the 'charitable exemption' provisions of the inheritance tax law in relation to the terms of the bequest here involved becomes purely a question of law. Under such circumstances a reviewing court is not bound by the construction thereof by the probate court, but must 'make the final determination in accordance with the applicable principles of law'. In re Estate of Platt, 21 Cal. 2d 343, 352, 131 P. 2d 825, 830."

In Re Mullen's Estate, 97 Mont. 144, 33 Pac. 2d 270 the duty resting upon an appellate court where there is no conflict in the testimony is thus stated:

"The only witnesses called by the objectors were the administrator, one of the members of the board of directors, and the receiver of the bank. There is no conflict in the testimony as between the several witnesses. Under this state of the record this court is called upon, as was the trial court, to say whether the undisputed testimony justifies the findings made."

See also Greene vs. Rhode Island Hospital Trust Company, 60 R. I. 184, 197 Atl. 464; Gar Wood Industries Inc. vs. Colonial Homes Inc., 305 Mass. 41, 24 N. E. 2d 767; E. J. Stanton & Sons vs. Los Angeles County, 78 Cal. App. 2d 181, 177 Pac. 2d 804; 5 C. J. S. 699, § 1656.

It is also contended that the question of whether the sales involved in this litigation were made within or without Wyoming was not presented in this court. With that contention we do not agree. In the appellant's brief we find this language:

"The sales transactions involved were sales made outside the State of Wyoming by a vendor who does not transact business in Wyoming."

And in respondent's brief it is argued:

"We think it cannot be disputed that a 'transfer of * * * possession' from appellant to the purchaser occurs 'within the exterior limits of the State of Wyoming' immediately upon arrival of the goods at point of destination in Wyoming. 'Further than that, it is self evident upon this record that 'transfer of title' simultaneously occurs with 'transfer of * * * possession' ".

* * * *

"Thus it seems to us clearly established that these transactions constitute the 'transfer of title or possession, or both' occurring 'within the exterior limits of the State of Wyoming' 1/ subject to 'An excise tax * * * equivalent to two per cent. (2%), * * * of the purchase price paid or charged * * *'—provided, of course, that such exaction is not inhibited by the commerce clause of the United States Constitution."

Other portions of these briefs, to say nothing of the oral argument on the hearing, might easily be quoted to the same effect all of which disclosed that the matter we passed upon in disposing of the case at bar was argued on both sides of this litigation.

In Wyuta Cattle Company vs. Connell, 43 Wyo. 135, 299 Pac. 279 in denying a petition for a rehearing this was said:

"It is urged that this court rendered its decision upon points neither assigned nor argued as error by appellant, contrary to the rule applied in many of our previous decisions. Automobile Insurance Co. v. Lloyd, 40 Wyo. 44, 273 Pac. 681, and cases cited. But we find in the record assignments of error challenging the sufficiency of the judgment under review as contrary to law and as not sustained by the evidence in the case. Those assignments are discussed in the brief of counsel for appellant, and . . . our attention was directly called to the claims of error therein set forth and required their consideration. It would seem strange that this court should be confined in examining and disposing of them solely to the argument and reasons put forward by appellant. Such a view might easily be productive of incorrect and unjust conclusions here." After citing with approval a decision of the Missouri Court of Appeals (Schaff vs. Nelson, 285 S. W. 1036) it was indicated with subsequent citation of substantial authorities that:

"Further, the rule that errors assigned but not discussed in the brief of appellant are deemed abandoned, is itself not inflexible when those errors are extremely serious in character and appear unmistakably and clearly upon the face of the record in the course of the reviewing court's investigation of it. That this is so is repeatedly evidenced by the decisions of other appellate courts possessing a rule of practice similar to our own and to which reference has above been made."

It may be appropriately noted just here that precisely the same assignments of error appear in the record

of the case now before us as were mentioned in the Wyuta case excerpt supra.

It is finally urged that the State cannot be estopped in the collection of its revenue by an unauthorized rule or regulation of its officers. With that contention there can be no quarrel. But Section 32-2518 W. C. S. 1945 expressly authorizes the State Board of Equalization to administer the Sales Tax Act of this state and to make certain rules in connection therewith. The language of the section on that point is:

"The administration of this Act (§§32-2501—32-2523) is vested in and shall be exercised by the State Board of Equalization of Wyoming which may prescribe forms and reasonable rules and regulations in conformity with this Act for making of returns and for the *ascertainment, assessment and collection of the taxes imposed hereunder.* (Italics supplied).

So the Board was undoubtedly duly authorized to make rules regarding the ascertainment of the taxes due and the general administration of the Tax Act.

It would seem that counsel has misapprehended the effect of what was said in the original opinion regarding Rule 25 (or Rule 24 as now designated) of the Board. We did not base our disapproval of the judgment below on the alleged estoppel of State officials in collecting revenue. It was upon the view that a plain rule which had stood upon the statute books for more than a decade and which had never been repealed or changed should be disregarded and its interpretation changed so as to *retroactively* and unjustly affect tax payers dealing with the Board in such matters. As pointed out in the original opinion the authorities cited in that opinion, including the Supreme Court of the United States, make it clear that that should not be done.

Much more could be said regarding the points suggested by the petition for a rehearing but we shall rest content with what has been said above and in the original discussion of this case by adding thereto the following language from Michigan Bell Telephone Company vs. Michigan Public Service Commission, 315 Mich. 533, 24 N. W. 2d 200 where, speaking of retroactive official action, the court remarks:

"Nor do we agree with appellant's contention that from its broad statutory powers it should be *implied* that the commission is authorized to retroactively adjust charges or rates previously fixed, when circumstances arise which seem to call for such readjustment. In fixing rates the commission acts in a legislative capacity; and an order of the commission establishing a utility rate must be construed as a statute of like character would be construed. In Harrison v. Metz, 17 Mich. 377, Justice Cooley said: 'legislation is to have a prospective operation only, except where the contrary intent is expressly declared or is necessarily to be implied from the terms employed.' More recently we have held: '* * * that all statutes are prospective in their operation excepting in such cases as the contrary clearly appears from the context of the statute itself'. Detroit Trust Co. v. City of Detroit, 269 Mich. 81, 256 N. W. 811. The Federal supreme court lately said:

" 'Retroactivity, even where permissible, is not favored, except upon the clearest mandate. It is the normal and usual function of legislation to discriminate between closed transactions and future ones or others pending but not completed.' Claridge Apartments Co. v. Comm'r of Internal Revenue, 323 U. S. 141, 65 S. Ct. 172, 185, 89 L. Ed. 139."

In connection with the language just quoted may properly be considered what was said by the Supreme Court of California in California Drive-in Restaurant vs. Clark, 22 Cal. 2d 287, 140 Pac. 2d 657 as follows:

"Generally", says the court,

"the same rules of construction and interpretation which apply to statutes govern the construction and interpretation of rules and regulations of administrative agencies. Miller v. United States, 294 U. S. 435, 55 S. Ct. 440, 79 L. Ed. 977."

And 54 Harvard Law Review, 398, 413 very justly and reasonably states that:

"But after a while, an interpretive regulation becomes seasoned. It becomes something upon which people justifiably rely; and then the principle of non-retroactivity should be given controlling force. The time should come, and before too long, when an interpretive regulation should pass so far beyond the Commissioner's power that he cannot make an amendment which will be effective retroactively. The elements of contemporaneousness and long-continuedness, and the requirements of certainty and predictability should rather soon outweigh the factors of uniformity and administrative facility so far as retroactive changes are concerned. Flexibility in the administration of the statute, freedom in the administrative authorities to fit the law to life are clearly desirable. But where retroactivity is involved, these ends may be sufficiently met by allowing administrative freedom in the early days of the statute and denying it after the administrative action has taken form and shape and become definite. This should be established by judicial decision, as a part of the administrative common law which the Court is now being called upon to formulate."

Being satisfied that the reasoning employed and the result reached in the original opinion on file herein was right the petition for a rehearing is denied.

*Rehearing denied.*

KIMBALL J. and BLUME, J. concur.